## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | |
|---|---|
| **BRIAN THOMPSON**, *individually and on behalf of all others similarly situated*,<br><br>    Plaintiff,<br><br>v.<br><br>**FUNDAMENTAL ADMINISTRATIVE SERVICES, LLC**<br>950 Ridgebrook Road<br>Sparks, MD 21152<br>Baltimore County<br><br>and<br><br>**THI OF NEVADA II AT DESERT LANE, LLC** d/b/a **HORIZON HEALTH & REHABILITATION CENTER**<br>112 North Curry Street<br>Carson City, NV 89703<br><br>    Defendants. | Case No.:<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Brian Thompson, individually and on behalf of all others similarly situated ("Class Members"), bring this action against Defendants, Fundamental Administrative Services, LLC ("Fundamental") and Thi of Nevada II at Desert Lane, LLC d/b/a Horizon Health & Rehabilitation Center ("Horizon") (collectively, "Defendants"), alleging as follows.

### I. INTRODUCTION

1. This class action arises from Defendants' failure to properly secure and safeguard Plaintiff's and Class Members' sensitive personal health information ("PHI") and personal identifiable information ("PII") from a foreseeable, preventable data breach.

2.      Between October 27, 2024 and January 13, 2025, criminal hackers accessed Fundamental's network systems and stole Plaintiff's and Class Members' Private Information stored therein, including their names, dates of birth, driver's license or state identification numbers, Social Security numbers, financial account information, medical treatment information, health insurance and Medicaid/Medicare information, and other sensitive data (collectively, "Private Information"), causing widespread injuries to Plaintiff and Class Members (the "Data Breach").

3.      Fundamental operates and manages a group of over 60 nursing homes and rehabilitation centers located throughout the United States, including Horizon.

4.      Plaintiff and Class Members are current and former patients of Horizon and other nursing homes and rehabilitation centers that contracted Fundamental to provide operational and management services. As a condition of receiving healthcare, Plaintiff and Class Members were required to entrust their sensitive, non-public Private Information to their providers and, through those providers, to Fundamental.

5.      Healthcare providers and their business associates that handle patients' Private Information (like Defendants) owe the individuals to whom the information relates a duty to adopt reasonable measures to protect it from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to the invasion of their private health and financial matters.

6.      In providing their Private Information to Defendants, Plaintiff and the Class Members reasonably expected these sophisticated business entities to keep their Private

Information confidential and security maintained, to use this information for business purposes, and to disclose it only as authorized. Defendants failed to do so, resulting in the unauthorized disclosure of their Private Information in the Data Breach.

7. Defendants breached their duties owed to Plaintiff and Class Members by failing to safeguard the Private Information they collected and maintained, including by failing to implement industry standards for data security to protect against cyberattacks and, as to Horizon, by failing to reasonably supervise its vendor's cybersecurity practices, which caused criminal hackers to access and steal millions of individuals' Private Information from Defendants' care.

8. Defendants failed to adequately protect Plaintiff's and Class Members' Private Information—and indeed, failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and their utter disregard for Class Members' privacy.

9. Hackers targeted and obtained Plaintiff's and Class Members' Private Information from Fundamental's systems because of the data's value in exploiting and stealing their identities. As a direct and proximate result of Defendants' inadequate data security and breaches of their duties to handle Private Information with reasonable care, the risk of identity theft caused by this Data Breach is impending and has materialized, as Plaintiff's and Class Members' Private Information was targeted, accessed, misused, and disseminated on the dark web. This present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

10. As a result of the Data Breach, Plaintiff and Class Members, suffered concrete injuries in fact including, but not limited to (a) costs mitigating the materialized and imminent risk of identity theft; (b) loss of time and productivity mitigating the materialized and imminent risk of identity theft; (c) actual identity theft and fraud; (d) costs and lost time due to actual identity theft;

(e) deprivation of value of their Private Information; (f) loss of privacy; (g) emotional distress; and (h) the continued risk to their Private Information, which remains subject to further breaches so long as Defendants fail to undertake adequate measures to protect it.

11.    To recover for these harms, Plaintiff, on behalf of himself and the Class as defined herein, brings claims for negligence/negligence *per se*, breach of implied contract, and unjust enrichment against Defendants.

## II. PARTIES

12.    Plaintiff Brian Thomas is an individual and a resident of Clark County, Nevada.

13.    Defendant Fundamental Administrative Services, LLC is a Delaware LLC with its principal place of business at 950 Ridgebrook Road, Sparks, Maryland 21152.

14.    Defendant Thi of Nevada II at Desert Lane, LLC d/b/a Horizon Health & Rehabilitation Center is a Delaware LLC with its principal place of business at 112 North Curry Street, Carson City, Nevada 89703.

## III.   JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because the amount in controversy exceeds $5 million, exclusive of interest and costs, and the number of Class Members exceeds 100, many of whom have different citizenship from Defendants.

16.    This Court has personal jurisdiction over Fundamental because it is headquartered in Maryland and it engages in substantial and not isolated activity in this state.

17.    This Court has personal jurisdiction over Horizon because it is engaged in substantial and not isolated activity in Maryland and has sufficient minimal conducts with this state by virtue of its engaging in business in Maryland, including by contracting with Maryland-

headquartered Fundamental and collecting and/or storing Plaintiff's and Class Members' Private Information in the state, which activities and business give rise to the claims alleged herein.

18.    Venue is proper under 28 U.S.C. § 1391(b) because Defendants operate in this District and a substantial part of the events or omissions giving rise to this action occurred here.

## IV.  GENERAL FACTUAL ALLEGATIONS

**A.    Defendants Collected and Maintained Plaintiff's and Class Members' Private Information to Operate and Facilitate Their Respective Businesses.**

19.    Fundamental operates and manages a chain of nursing homes and rehabilitation centers across the United States. Fundamental's services provided include administration and data management in connection with Plaintiff's and Class Members' Private Information provided to Horizon and other centers under Fundamental's management.

20.    As a necessary part of using Fundamental's services, Fundamental's clients granted Fundamental access to and control over Plaintiff's and Class Members' Private Information.

21.    At all relevant times, Defendants knew Fundamental was using its systems to manage, store, and transmit valuable, sensitive Private Information, and that as a result, those systems would be attractive targets for cybercriminals.

22.    Defendants also knew that any breach of Fundamental's information technology systems and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the thousands of individuals whose Private Information is compromised, as well as intrusion into those individuals' sensitive health matters.

23.    As a condition of and in exchange for receiving healthcare, Plaintiff and Class Members were required to entrust their highly sensitive Private Information to Horizon and other centers under Fundamental's operation, and through those healthcare providers, to Fundamental.

24.    Fundamental derived economic benefits from collecting Plaintiff's and Class

Members' Private Information, and indeed, receives payment for management and administration services using that data. Without the required submission of Private Information, Fundamental could not perform its operations or generate revenue.

25.     Horizon also derived economic benefits from collecting Private Information. Without the Private Information Plaintiff and Class Members were required to provide, Horizon could not provide healthcare services or bill or receive payment for services provided.

26.     In addition to Horizon, a number of other facilities provided their patients' PII and/or PHI to Fundamental, which PII and/or PHI was also compromised in the Data Breach.

27.     In exchange for receiving Plaintiff's and Class Members' Private Information, Defendants promised to safeguard the sensitive and confidential data, to use it only for authorized purposes, and to delete it from their systems once there was no longer a need to maintain it.

28.     Fundamental's Notice of Privacy Practices, which applies to and binds all facilities under Fundamental's operation and management, including Horizon, expressly affirms Defendants' legal obligations with respect to Plaintiff's and Class Members' Private Information. The Notice of Privacy practices states the specific circumstances in which PHI may be disclosed, none of which include disclosure to unauthorized cybercriminals as in this Data Breach.

29.     But for Defendants' promises to keep Plaintiff's and Class Members' Private Information secure and confidential, Plaintiff and Class Members would not have sought services from or entrusted their Private Information to Defendants.

**B.      Defendants Owed Duties to Adopt Reasonable Data Security Measures for Private Information they Collected and Maintained.**

30.     As part of their respective businesses, Defendants collect and maintain hundreds of thousands of individuals' Private Information, including that of Plaintiff and Class Members.

31.     Defendants had and continue to have duties to adopt reasonable measures to keep

Plaintiff's and Class Members' Private Information protected from unauthorized disclosure, and to audit, monitor, and verify the integrity of their networks and those of their vendors and affiliates.

32.     Defendants' obligations stem from the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, the Health Insurance Portability and Accountability Act ("HIPAA"), common law, contract, industry standards, and representations made to Plaintiff and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure.

33.     Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

34.     Additionally, by obtaining, using, and benefitting from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew they were responsible for protecting that Private Information from unauthorized access and disclosure.

35.     Defendants' duty to protect Plaintiff and Class Members from the foreseeable risk of injury that inadequate data protection and unauthorized exposure of their Private Information would case obligated Defendants to implement reasonable practices to keep Plaintiff's and Class Members' sensitive Private Information confidential and securely maintained, to use and disclose it for necessary and authorized purposes only, to delete it from network systems when no longer necessary for legitimate business purposes, and, as to Horizon, to ensure the same data security protocols and procedures from its service provider Fundamental. Defendants failed to do so.

**C.      Defendants' Failures to Adequately Safeguard Plaintiff's and Class Member's Private Information Caused the Data Breach.**

36.     In August 2025, Fundamental began sending Plaintiff and other Data Breach victims correspondence informing them of the Data Breach ("Notice Letters").

37.     Despite its direct patient-provider relationship with Plaintiff and Class Members,

Horizon did not send separate notifications to its patients impacted by the Data Breach, relying solely on Fundamental's Notice Letters to alert Data Breach victims.

38.    The Notice Letters generally inform as follows, in part:

**What Happened?** On or about January 20, 2025, Fundamental became aware of suspicious activity related to its computer network. . . . The investigation determined that between October 27, 2024, and January 13, 2025, an unauthorized actor copied certain files on our computer network. . . .

**What Information Was Involved?** The information that may be affected includes [name's] Social Security number, driver's license or state identification number, financial account information, date of birth, medical treatment information, health insurance policy number, and/or Medicare/Medicaid plan, and name.

39.    Omitted from the Notice Letters were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained to Plaintiff and Class Members, who retain a vested interest in ensuring their Private Information is protected.

40.    Thus, Defendants' purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

41.    Plaintiff's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed and acquired confidential files containing Plaintiff's and Class Members' Private Information from Fundamental's network systems, where they were kept without adequate safeguards and in unencrypted form.

42.    As the Data Breach evidences, Defendants did not use reasonable security measures appropriate to the nature of the sensitive Private Information they collected and maintained from Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer

needed, or ensuring their vendors did the same. These failures by Defendants allowed and caused cybercriminals to target Plaintiff's and Class Members' Private Information on Fundamental's systems and carry out the Data Breach.

43.    Defendants failed to use reasonable security procedures and practices appropriate to the sensitive and confidential nature of Plaintiff's and Class Members' Private Information they collected and maintained, such as encrypting files containing Private Information, requiring MFA for initial access to servers containing Private Information, or deleting Private Information from network systems when it is no longer needed.

44.    Defendants could have prevented this Data Breach by properly securing and encrypting the files and servers containing Private Information, using controls like limitations on personnel with access to sensitive data and requiring multi-factor authentication ("MFA") for access, training employees on standard cybersecurity practices, and implementing reasonable logging and alerting methods to detect unauthorized access.

45.    For example, had Defendants implemented industry standard logging, monitoring, and alerting systems—basic technical safeguards that any PII/PHI-collecting company is expected to employ—then cybercriminals would not have been able to perpetrate prolonged malicious activity in Fundamental's network systems for *three months* without alarms going off, including the reconnaissance necessary to identify where Private Information was stored, installation of malware or other methods of establishing persistence and creating a path to exfiltrate data, staging data, or exfiltrating that data outside of Fundamental's systems, all without being caught.

46.    Defendants would have recognized the malicious activities detailed in the preceding paragraph had they bothered to implement basic monitoring and detection systems, which then would have stopped the Data Breach or greatly reduced its impact.

47.    In addition, Defendants could have prevented this Data Breach by implementing or requiring such reasonable safeguards as properly securing, sanitizing, and encrypting the files and servers containing Plaintiff's and Class Members' Private Information, but failed to do so.

**D.    Defendants Knew the Risk of a Data Breach because Healthcare Providers in Possession of Private Information are Particularly Suspectable.**

48.    Defendants' negligence in failing to safeguard Plaintiff's and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and secure sensitive data.

49.    Data thieves regularly target businesses in the healthcare industry like Defendants due to the highly sensitive information that such entities maintain. Defendants knew and understood that unprotected Private Information is highly sought after by criminals who seek to illegally monetize that Private Information through unauthorized access.

50.    In light of past high profile data breaches, Defendants knew or, if acting as reasonable healthcare providers handling PII and PHI, should have known the Private Information they collected and maintained would be vulnerable and targeted by cybercriminals.

51.    Defendants' data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting entities like Defendants that collect and store PHI.

52.    In 2023, an all-time high for data compromises occurred, with 3,205 compromises affecting 353,027,892 total victims. Of the 3,205 recorded data compromises, 809 of them, or 25.2% were in the medical or healthcare industry.

53.    Entities in custody of PHI, like Defendants, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach. Indeed, when compromised, healthcare related data is among the most sensitive and personally

consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[1] Almost 50% of the victims lost their healthcare coverage as a result, while nearly 30 percent said their insurance premiums went up. Forty percent of patients were never able to resolve their identity theft at all.

54.    Thus, the healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[2]

55.    PHI is particularly valuable because criminals can use it to target victims with frauds and scams that take advantage of the victim's medical conditions or victim settlements. It can be used to create fake insurance claims, allowing for the purchase and resale of medical equipment, or gain access to prescriptions for illegal use or resale.

56.    As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[3] A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.

57.    As healthcare providers in possession of Private Information, Defendants knew, or

---

[1] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET, March 3, 2010, available at https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited May 8, 2024).
[2] 9 Reasons why Healthcare is the Biggest Target for Cyberattacks, Swivelsecure, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Aug. 23, 2024).
[3] You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows, IDExperts, May 14, 2015, https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Aug. 23, 2024).

should have known, the importance of safeguarding the Private Information entrusted to them and of the foreseeable consequences if their or their vendor's systems were breached, including the significant costs that would imposed on Plaintiff and Class Members. Nevertheless, Defendants failed to implement or follow reasonable cybersecurity measures.

58.    Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

59.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on Fundamental's systems, amounting to tens of thousands of individuals' detailed Private Information, and, thus, that these individuals would be harmed by the unauthorized disclosure of that unencrypted data.

60.    Plaintiff and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

**E.    Defendants Were Required, But Failed to Comply with FTC Rules and Guidance.**

61.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

62.    In 2016, the FTC updated its publication, *Protecting Personal Information: A*

*Guide for Business*,[4] which establishes cyber-security guidelines for businesses like Defendants. These guidelines note that businesses should protect the consumer PII they keep; properly dispose of PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

63.    The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

64.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity; and verify that service providers have reasonable security measures.

65.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act.

66.    Such FTC enforcement actions include actions against entities in the healthcare industry like Defendants. *See, e.g., In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

67.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits unfair practices including, as

---

[4]    *Protecting Personal Information: A Guide for Business*, FED. TRADE COMM. (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed Aug. 22, 2024).

interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information.

68.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated, "Data is currency. The larger the data set, the greater potential for analysis and profit."[5]

69.    Defendants' failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

**F.    Defendants were Required, But Failed to Comply with HIPAA and HITECH.**

70.    Defendants are covered businesses under HIPAA (45 C.F.R. § 160.102) and required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and C.

71.    Defendants are further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. See 42 U.S.C. §17921; 45 C.F.R. § 160.103.

72.    HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

73.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in

---

[5] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

electronic media." 45 C.F.R. § 160.103.

74.    HIPAA's Security Rule required and requires that Defendants do the following:

a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information created, received, maintained, or transmitted;

b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c.  Protect against any reasonably anticipated unauthorized disclosures; and

d.  Ensure compliance by [their] workforce[s].

75.    HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants are required to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

76.    HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. See 45 C.F.R. § 164.306(a)(1), (a)(3).

77.    HIPAA further requires Defendants to mitigate, to the extent practicable, any harmful effect that is known to the entity of a use or disclosure of PHI in violation of the entity's policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. See 45 C.F.R. § 164.530(f).

78.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in

the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which "represent the industry standard for good business practices with respect to standards for securing e-PHI."[6]

79.     HIPAA's Breach Notification Rule further requires that within 60 days of discovering a breach of unsecured patient PHI, as is this Data Breach, Defendants must notify each individual affected regarding the nature of the breach, the PHI compromised, steps the individual should take to protect against potential resulting harm, and what Defendants are doing to protect against future breaches. 45 C.F.R. § 164.404(b).

80.     HIPAA further mandates Horizon and other facilities under Fundamental's management to require by contract and ensure that Fundamental uses appropriate safeguards to protect electronic PHI from unauthorized disclosure. 45 C.F.R. § 164.504(e)(2)(ii).

81.     Defendants violated HIPAA and HITECH. They failed to (a) maintain adequate security practices, systems, and protocols to prevent data loss, (b) mitigate the risks of a data breach, (c) ensure the confidentiality and protection of PHI, and (d) ensure that Fundamental used appropriate safeguards to prevent unauthorized disclosure of Private Information.

**G.     Defendants Failed to Comply with Industry Standards.**

82.     A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

83.     The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and

---

[6]     HHS, Guidance on Risk Analysis, July 22, 2024, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html?language=es (last visited Aug. 23, 2024).

Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

84.    In addition, the NIST recommends certain practices to safeguard systems, *infra*, such as the following:

a.   Control who logs on to your network and uses your computers and other devices.

b.   Use security software to protect data.

c.   Encrypt sensitive data, at rest and in transit.

d.   Conduct regular backups of data.

e.   Update security software regularly, automating those updates if possible.

f.   Have formal policies for safely disposing of electronic files and old devices; and

g.   Train everyone who uses your computers, devices, and network about cybersecurity.

85.    Upon information and belief, Defendants failed to implement industry standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the CIS CSC, which are established frameworks for reasonable cybersecurity readiness, as well as failing to comply with other industry standards, resulting in the Data Breach.

**H.    Defendants Owed Plaintiff and Class Members Common Law Duties to Safeguard their Private Information.**

86.    In addition to their obligations under federal and state laws, Defendants owed a

duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in their and/or their service providers' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. These duties obligated Defendants to provide reasonable data security consistent with industry standards and requirements to protect Plaintiff's and Class Members' Private Information in their or their service providers' care from unauthorized disclosure.

87.     Defendants owed duties to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their and/or their service providers' possession, including adequately training their employees and others who accessed Private Information on how to adequately protect Private Information.

88.     Defendants owed duties to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

89.     Defendants owed duties to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

90.     Defendants owed duties to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

91.     Defendants owed duties to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

92.     Defendants failed to take the necessary precautions to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. Defendants' actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

I.     **Plaintiff and Class Members Suffered Common Injuries and Damages.**

93.     Defendants' failure to implement or maintain adequate data security measures

directly and proximately caused Plaintiff's and Class Members' injuries via the Data Breach.

94.    The ramifications of Defendants' failures to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

95.    Plaintiff and Class Members are also at a continued risk because their Private Information remains in Defendants' systems, which have already been shown to be susceptible to compromise and are subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect their customers' Private Information.

96.    As a result of Defendants' ineffective and inadequate data security practices, the consequential Data Breach, and the foreseeable outcome of Plaintiff's and Class Members' Private Information ending up in criminals' possession, all Plaintiff and Class Members have suffered and will continue to suffer numerous actual injuries and damages.

### Present and Ongoing Risk of Identity Theft

97.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

98.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize it. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

99.    The dark web is an unindexed layer of the internet that requires special software or authentication to access. Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on

the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion. This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

100.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PHI and PII like the Private Information at issue here. The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information. As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[7]

101.    The unencrypted Private Information of Plaintiff and Class Members will end up for sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized actors can easily access and misuse Plaintiff's and Class Members' Private Information due to the Data Breach.

102.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

103.    For example, armed with just a name and date of birth, a data thief can utilize a

---

[7] *What is the dark web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

104.    Social Security numbers, for example, are among the worst kind of PII to have stolen because they may be put to numerous serious fraudulent uses:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[8]

105.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

106.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[9]

---

[8]    Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.
[9]    Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Aug. 23, 2024).

107.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, or even give the victim's PII to police during an arrest resulting in an arrest warrant issued in the victim's name.

108.    Theft of PHI, in particular, is gravely serious as well: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[10]

109.    PHI is also used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.

110.    Another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[11]

111.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.

112.    With Fullz packages, cybercriminals can cross-reference two sources of Private Information to marry unregulated data to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

113.    The development of Fullz packages means here that the stolen Private Information

---

[10] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Aug. 23, 2024).
[11] DistilInfo, 70% Of Data Involved In Healthcare Breaches Increases Risk of Fraud (Oct. 3, 2019), https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/ (last visited Aug. 23, 2024).

from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. Thus, even if certain information was not stolen in the data breach, criminals can still easily create a comprehensive Fullz package.

114.    The development of Fullz packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

115.    Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice,

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees).[12]

116.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

117.    Further complicating the issues faced by victims of identity theft, data thieves may

---

[12] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 23, 2024).

wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

118.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

119.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

120.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record

121.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

122.    Plaintiff and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes and alerts with credit reporting

agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach.

123.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendants' conduct that caused the Data Breach.

### *Diminished Value of Private Information*

124.    Private Information is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

125.    For example, drug and medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

126.    Private Information can sell for as much as $363 per record. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.

127.    An active and robust legitimate marketplace for Private Information also exists. In

fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.

128.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

129.    However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Reasonable and Necessary Future Cost of Credit and Identify Theft Monitoring***

130.    To date, Defendants have done little to nothing to provide Plaintiff and Class Members with relief for the damages they have suffered due to the Data Breach. Horizon, which had a direct relationship with Plaintiff and Class Members, did not offer Data Breach victims even minimal compensation like temporary complimentary credit monitoring services, or even bother to notify their customers of their Private Information's unauthorized exposure in the Data Breach.

131.    Unsurprisingly, given the type of targeted attack and sophisticated criminal activity, the type of Private Information involved, and the *modus operandi* of cybercriminals, there is evidence that at least entire batches of stolen information have been placed on the dark web for sale and purchase by criminals intending to utilize it for identity theft crimes. For example, since the Data Breach, Plaintiff has received multiple notifications from different credit monitoring and financial services that his compromised Private Information has been published on the dark web.

132.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or his Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

133.    Furthermore, the information involved in the Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers and medical records), and thus significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close card accounts.

134.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member, is a reasonable and necessary cost to protect against the risk of identity theft the Data Breach caused, which Plaintiff and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

### *Lost Benefit of the Bargain*

135.    Furthermore, Defendants' poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

136.    When agreeing to provide their Private Information, which was a condition precedent to obtain healthcare, and paying Defendants, directly or indirectly, for these services, Plaintiff and Class Members understood and expected they were, in part, paying for services and legally required data security to protect the Private Information they were required to provide.

137.    In fact, Defendants did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Horizon.

## V. PLAINTIFF'S EXPERIENCE AND INJURIES

138.    Plaintiff is a former patient of Horizon and its manager and operator Fundamental, having received treatment at Horizon in 2023.  As of condition of receiving healthcare from Defendants, Plaintiff was required to supply Defendants with his confidential Private Information.

139.    Plaintiff greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

140.    Plaintiff would not have provided his Private Information to Defendants had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

141.    At the time of the Data Breach—between October 2024 and January 2025—Defendants retained Plaintiff's Private Information in Fundamental's network systems with inadequate data security, causing Plaintiff's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

142.    In August 2025, Plaintiff received a Notice Letter informing that his Private Information was accessed and exposed to unknown, unauthorized third parties in the Data Breach.

143.    To Plaintiff's knowledge, he has not been affected by any other breach involving his PII or PHI other than this Data Breach, as he has not received any other notice letter informing him that his data had been affected in a similar event.

144.    Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to reviewing credit reports and financial account statements for indications of identity theft. Plaintiff now monitors his statements multiple times a week and has spent hours dealing with the Data Breach.

145.    Plaintiff further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff is at present risk and will continue to be at increased risk of identity theft for years.

146.    The risk of identity theft is impending and has materialized, as Plaintiff's Private Information was targeted, accessed, and stolen in the Data Breach, and is now being misused. Demonstrating such misuse, since and due to the Data Breach, Plaintiff has received multiple notifications from Experian, CreditWise, and IDX credit monitoring services informing that his compromised Private Information has been found published on the dark web.

147.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendants have still not fully informed him of key details about the Data Breach's occurrence or the information stolen.

148.    Moreover, Plaintiff has experienced a sharp uptick suspicious spam calls, texts, and emails using and specifically referring to his Private Information exposed in the Data Breach, and believes this be an attempt to secure additional information from or about him.

## VI.    CLASS ACTION ALLEGATIONS

149.    Plaintiff brings this nationwide class action on behalf of himself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

150.    The class Plaintiff seeks to represent is defined as follows:

All individuals in the United States whose Private Information may have been compromised in the Data Breach, including all individuals who received a Notice Letter ("Class").

151.    Excluded from the Class are the following individuals and/or entities: Defendants and Defendants' parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

152.    **Numerosity:** The Class is so numerous that joinder of all members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, upon information and belief, the Private Information of at least 58,000 individuals throughout the United States was compromised in the Data Breach.

153.    **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

a.    Whether Defendants unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information;

b.    Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class Members;

c.    Whether Defendants knew or should have known of the data security vulnerabilities that allowed the Data Breach to occur;

d.    Whether Defendants failed to adequately safeguard Private Information;

e.    When Defendants actually learned of the Data Breach;

f.    Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members their Private Information had been compromised;

g.    Whether Defendants' conduct violated the FTC Act, HIPAA, and/or HITECH;

h.    Whether Defendants were unjustly enriched by failing to provide adequate security for Plaintiff's and Class Members' Private Information;

i.    Whether Plaintiff and Class Members are entitled to actual, consequential, nominal, statutory, and/or punitive damages as a result of Defendants' wrongful conduct; and

j.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm the Data Breach caused.

154.  **Typicality:** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subject to the same unlawful conduct as alleged herein, and were damaged in the same way. Plaintiff's Private Information was in Defendants' possession and compromised due to the Data Breach. Plaintiff's damages and injuries are akin to those of other Class Members, and Plaintiff seeks relief consistent with the relief of the Class.

155.  **Adequacy:** Plaintiff is an adequate representative of the Class because he is a Class Member and is committed to pursuing this matter to obtain relief for the Class. Plaintiff has no conflicts of interest with the Class. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class.

156.  **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to Plaintiff and Class Members may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and Class Members are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable and strain the court system, creating the potential for inconsistent or contradictory judgments and increasing the delay and expense to all involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

157.   **Manageability:** The litigation of the class claims alleged herein is manageable. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates there would be no significant manageability problems with prosecuting this lawsuit as a class action. Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

158.   **Ascertainability:** All members of the proposed Class are readily ascertainable. The Class is defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the Class. Defendants have access to information regarding the individuals affected by the Data Breach, and Fundamental has already provided notifications to some or all of those people. Using this information, the members of the Class can be identified, and their contact information ascertained for purposes of providing notice.

159.   **Particular Issues:** Particular issues are appropriate for certification under Rule 23(c)(4) because their resolution would advance the disposition of this matter and the parties' interests therein, including but not limited to the following:

a.   Whether Defendants owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b.   Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.   Whether an implied contract existed between Defendants and Class Members;

d.   Whether Defendants adequately informed Class Members of the Data Breach;

e.   Whether Class Members are entitled to actual, consequential, statutory, and/or nominal damages, and/or injunctive relief as a result of Defendants' wrongful conduct.

160.   **Policies Generally Applicable to the Class:** Finally, class certification is also

appropriate under Rule 23(b)(2) and (c). Defendants have acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct with respect to the Class, not on facts or law applicable only to Plaintiff.

### VII.    CAUSES OF ACTION

#### COUNT I: NEGLIGENCE/NEGLIGENCE *PER SE*
(On behalf of Plaintiff and the Class, against Defendants)

161.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 192 above as if fully set forth herein.

162.    Defendants required Plaintiff and Class Members to submit, directly or indirectly, personal, confidential Private Information to Defendants as a condition of receiving healthcare; Plaintiff and Class Members provided their Private Information to Defendants.

163.    Defendants had full knowledge of the sensitivity of the Private Information to which they were entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendants had duties to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information, including requiring and ensuring their service providers handling Private Information had reasonable and appropriate data security measures and policies in place to do so.

164.    Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendants.

165.    Defendants were able to ensure their systems and data security procedures were

sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiff and Class Members were not.

166.    By collecting and storing Plaintiff's and Class Members' Private Information, Defendants had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the Private Information from theft.

167.    Defendants' duty of care obligated them to require and ensure that Fundamental provided data security data security consistent with industry standards and legal and regulatory requirements, and that Fundamental's systems and networks and the personnel responsible for them adequately protected Plaintiff's and Class Members' Private Information.

168.    Defendants' duty of care further obligated them to ensure their data security processes to detect compromises of Private Information were sufficient.

169.    Defendants had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

170.    Pursuant to the FTC Act, Defendants had a duty to provide adequate data security practices to safeguard Plaintiff's and Class Members' Private Information.

171.    Pursuant to HIPAA, Defendants had the further duty to implement reasonable safeguards to protect Plaintiff's and Class Members' PHI from unauthorized disclosure.

172.    Pursuant to HIPAA, Defendants had a duty to require reasonable data security measures for the PHI in their and/or their service providers' care, including by, *e.g.*, rendering the electronic PHI it maintained in a form unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule.

173.    Additionally, pursuant to HIPAA, Defendants had a duty to provide notice of the Data Breach within 60 days of discovering it.

174.    Defendants breached their duties to Plaintiff and Class Members under the FTC Act and HIPAA by failing to provide and/or to require their service provider provide fair, reasonable, or adequate security to safeguard Plaintiff's and Class Members' Private Information, by failing to ensure Private Information was encrypted and timely deleted when no longer needed, and by failing to provide notice of the Data Breach until over 60 days after discovering it.

175.    Defendants' violations of the FTC Act and HIPAA directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiff and Class Members.

176.    Plaintiff and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

177.    The type of harm that resulted from the Data Breach was the type of harm the FTC Act and HIPAA were intended to guard against.

178.    Defendants' failures to comply with the FTC Act and HIPAA is negligence *per se.*

179.    Defendants breached their duties and were negligent by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure in the Data Breach. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

   a.   Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

   b.   Failing to adequately train employees on proper cybersecurity protocols;

   c.   Failing to adequately monitor the security of their networks and systems;

   d.   Failing to require and periodically ensure that Fundamental adopted, implemented,

and maintain adequate security measures to safeguard Private Information;

    e.   Failure to require and periodically ensure their network systems had plans in place to maintain reasonable data security safeguards; and

    f.   Allowing unauthorized access to Plaintiff's and Class Members' Private Information despite the foreseeable risk.

180.    But for Defendants' wrongful and negligent breaches of their duties owed to Plaintiff and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiff's and Class Members' Private Information would not have been compromised, and Plaintiff's and Class Members' injuries would have been avoided.

181.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) diminished value of Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with mitigating the consequences of the Data Breach, including but not limited to lost time; and (e) the continued and certainly increased risk to their Private Information, which remains subject to further unauthorized disclosures so long as Defendants fail to undertake adequate measures to protect it.

182.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to emotional distress, loss of privacy, and other economic and non-economic losses.

183.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT II: BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiff and the Class, against Defendants)

184.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 192 above

as if fully set forth herein.

185.    Defendants required Plaintiff and Class Members to provide and entrust their Private Information to Defendants as a condition of obtaining healthcare.

186.    When Plaintiff and Class Members provided their Private Information and/or payment to Defendants, they formed implied contracts pursuant to which Defendants agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members if and when their Private Information was breached and compromised.

187.    The valid and enforceable implied contracts Plaintiff and Class Members formed with Defendants included Defendants' implied promises to protect Plaintiff's and Class Members' Private Information from unauthorized disclosures.

188.    Defendants promised Plaintiff and Class Members, including through Fundamental's Notice of Privacy Practices identified above, which also applies to and governs Horizon, to maintain the privacy and confidentiality of the Private Information they collected and to keep such information safeguarded against unauthorized access and disclosure.

189.    Defendants' adequate protection of Plaintiff's and Class Members' Private Information was a material aspect of these implied contracts with Defendants.

190.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with industry standards and relevant laws and regulations, including the FTC Act, HIPAA, and HITECH.

191.    Plaintiff and Class Members who provided their Private Information to Defendants reasonably believed and expected that Defendants would adequately employ adequate data security to protect that Private Information. Defendants failed to do so.

192.    A meeting of the minds occurred when Defendants required Plaintiff and the Class

Members to provide their Private Information as a mandatory condition to their receipt of healthcare services and when Plaintiff and Class Members agreed to, and did, provide their Private Information to Defendants.

193.    Defendants materially breached their contractual obligations to protect the Private Information they required Plaintiff and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to Defendants' inadequate data security measures and procedures.

194.    Defendants materially breached their contractual obligations to deal in good faith with Plaintiff and Class Members when they failed to take adequate precautions to prevent the Data Breach and failed to promptly notify Plaintiff and Class Members of the Data Breach.

195.    Defendants materially breached the terms of their implied contracts, including but not limited to by failing to comply with industry standards or the standards of conduct embodied in statutes like Section 5 of the FTC Act, by failing to otherwise protect Plaintiff's and Class Members' Private Information, and/or by failing to prevent the same data security failures by their business associate/vendor Fundamental that handled Private Information, as set forth *supra*.

196.    The Data Breach was a reasonably foreseeable consequence of Defendants' conduct in breach of these implied contracts with Plaintiff and Class Members.

197.    As a direct and proximate result of Defendants' breach of their implied contracts with Plaintiff and Class Members and the attendant Data Breach, Plaintiff and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendants.

198.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

## COUNT III: UNJUST ENRICHMENT
**(On behalf of Plaintiff and the Class, against Defendants)**

199.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 194 above as if fully set forth herein.

200.    Plaintiff and Class Members conferred benefits on Defendants by way providing their Private Information to Defendants as part of Defendants' business operations.

201.    Defendants required Plaintiff's and Class Members' Private Information to conduct business and generate revenue.

202.    The monies Plaintiff and Class Members paid to Defendants included a premium for Defendants' cybersecurity obligations and were supposed to be used by Defendants, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiff's and Class Members' Private Information.

203.    Instead, Defendants enriched themselves by saving the costs they reasonably should have expended on data security to secure Private Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendants calculated to increase their own profits at Plaintiff's and Class Members' expense by using cheaper, ineffective measures and diverting those funds to Defendants' own coffers.

204.    Defendants failed to provide reasonable security and safeguards to the Private Information of Plaintiff and Class Members, and as a result, Defendants were unjustly enriched.

205.    Under principles of equity and good conscience, Defendants should not be permitted to retain their ill-gotten gains because they failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' Private Information, which Plaintiff and Class Members paid for but did not receive.

206.    Defendants wrongfully accepted and retained these benefits—payment and Private

Information—and were enriched to the detriment of Plaintiff and Class Members.

207.    Due to Defendants' unjust enrichment, Plaintiff and Class Members are entitled to restitution and disgorgement of profits obtained by Defendants.

## VIII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all others similarly situated, prays for judgment as follows:

A.      An Order certifying this case as a class action on behalf of the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B.      Awarding Plaintiff and the Class damages that include applicable compensatory, actual, statutory, nominal, exemplary, and punitive damages, as allowed by law;

C.      Awarding restitution to Plaintiff and the Class;

D.      Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E.      Awarding injunctive relief in the form of additional technical and administrative cybersecurity controls as is necessary to protect the interests of Plaintiff and the Class;

F.      Enjoining Defendants from further deceptive practices and making untrue statements about their data security, the Data Breach, and the transmitted Private Information;

G.      Awarding attorneys' fees and costs, as allowed by law;

H.      Awarding prejudgment and post-judgment interest, as provided by law; and

I.      Awarding such further relief to which Plaintiff and the Class are entitled.

## IX.    DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues to triable.

Dated: October 3, 2025                    Respectfully submitted,

                                          */s/ Jeff Ostrow*

                                          Jeff Ostrow
                                          **KOPELOWITZ OSTROW P.A.**
                                          One West Las Olas Blvd, Suite 500
                                          Fort Lauderdale, FL 33301
                                          Tel: (954) 525-4100
                                          ostrow@kolawyers.com

                                          *Counsel for Plaintiff and the Putative Class*